**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VMG SALSOUL, LLC, a
Delaware limited liability
company,
        *Plaintiff-Appellant*,

    v.

MADONNA LOUISE
CICCONE, professionally
known as Madonna, an
individual; SHEP PETTIBONE,
an individual; WB MUSIC
CORPORATION, a Delaware
corporation; WEBO GIRL
PUBLISHING, INC., a
California corporation;
LEXOR MUSIC, INC., a New
York corporation; WARNER
MUSIC GROUP, a Delaware
corporation; WARNER BROS.
RECORDS, INC., a Delaware
corporation,
        *Defendants-Appellees.*

Nos. 13-57104
14-55837

D.C. No.
2:12-cv-05967-BRO-CW

OPINION

2          VMG SALSOUL V. CICCONE

Appeals from the United States District Court
for the Central District of California
Beverly Reid O'Connell, District Judge, Presiding

Argued and Submitted April 5, 2016
Pasadena, California

Filed June 2, 2016

Before:  Barry G. Silverman and Susan P. Graber, Circuit
Judges, and David A. Ezra,* District Judge.

Opinion by Judge Graber;
Dissent by Judge Silverman

**SUMMARY**[**]

**Copyright**

The panel affirmed the district court's summary judgment
in favor of the defendants and vacated an award of attorney's
fees on a claim that in the Madonna song *Vogue*, a modified
version of a horn segment allegedly copied from a song
known as *Love Break* violated the plaintiff's copyrights to
*Love Break*.

---

[*] The Honorable David A. Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Affirming the district court's summary judgment, the panel held that any copying that occurred was "de mimimis" and not an infringement of either the composition or the sound recording of *Love Break*. The panel agreed with the district court that, as a matter of law, a general audience would not recognize the brief snippet in *Vogue* as originating from *Love Break*. Disagreeing with the Sixth Circuit, the panel held that Congress did not eliminate the de minimis exception to claims alleging infringement of a sound recording in 17 U.S.C. § 114(b).

The panel held that the district court abused its discretion in granting attorney's fees to the defendants under 17 U.S.C. § 505. The panel held that a claim premised on a legal theory adopted by the only circuit court to have addressed the issue is, as a matter of law, objectively reasonable.

Dissenting, Judge Silverman wrote that the court should follow the Sixth Circuit and hold that the use of an identical copy of a portion of a copyrighted fixed sound recording is an infringement.

## COUNSEL

Robert S. Besser (argued) and Christopher Chapin, Law Offices of Robert S. Besser, Santa Monica, California, for Plaintiff-Appellant.

Alexander Kaplan (argued), Proskauer Rose LLP, New York, New York; Richard S. Busch (argued) and Paul H. Duvall, King & Ballow, San Diego, California; and Sandra A. Crawshaw-Sparks and Susan L. Gutierrez, Proskauer Rose LLP, Los Angeles, California, for Defendants-Appellees.

## OPINION

GRABER, Circuit Judge:

In the early 1990s, pop star Madonna Louise Ciccone, commonly known by her first name only, released the song *Vogue* to great commercial success. In this copyright infringement action, Plaintiff VMG Salsoul, LLC, alleges that the producer of *Vogue*, Shep Pettibone, copied a 0.23-second segment of horns from an earlier song, known as *Love Break*, and used a modified version of that snippet when recording *Vogue*. Plaintiff asserts that Defendants Madonna, Pettibone, and others thereby violated Plaintiff's copyrights to *Love Break*. The district court applied the longstanding legal rule that "de minimis" copying does not constitute infringement and held that, even if Plaintiff proved its allegations of actual copying, the claim failed because the copying (if it occurred) was trivial. The district court granted summary judgment to Defendants and awarded them attorney's fees under 17 U.S.C. § 505. Plaintiff timely appeals.

Reviewing the summary judgment de novo, *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1051 (9th Cir. 2015), we agree with the district court that, as a matter of law, a general audience would not recognize the brief snippet in *Vogue* as originating from *Love Break*. We also reject Plaintiff's argument that Congress eliminated the "de minimis" exception to claims alleging infringement of a sound recording. We recognize that the Sixth Circuit held to the contrary in *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), but—like the leading copyright treatise and several district courts—we find *Bridgeport*'s reasoning unpersuasive. We hold that the "de minimis" exception applies to infringement actions concerning

copyrighted sound recordings, just as it applies to all other copyright infringement actions. Accordingly, we affirm the summary judgment in favor of Defendants.

But we conclude that the district court abused its discretion in granting attorney's fees to Defendants under 17 U.S.C. § 505. *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1180 (9th Cir. 2013) (holding that we review for abuse of discretion the district court's award of attorney's fees under § 505). A claim premised on a legal theory adopted by the only circuit court to have addressed the issue is, as a matter of law, objectively reasonable. The district court's conclusion to the contrary constitutes legal error. We therefore vacate the award of fees and remand for reconsideration.

## FACTUAL AND PROCEDURAL HISTORY

Because this case comes to us on appeal from a grant of summary judgment to Defendants, we recount the facts in the light most favorable to Plaintiff. *Alcantar*, 800 F.3d at 1051.

In the early 1980s, Pettibone recorded the song *Ooh I Love It (Love Break)*, which we refer to as *Love Break*. In 1990, Madonna and Pettibone recorded the song *Vogue*, which would become a mega-hit dance song after its release on Madonna's albums. Plaintiff alleges that, when recording *Vogue*, Pettibone "sampled" certain sounds from the recording of *Love Break* and added those sounds to *Vogue*. "Sampling" in this context means the actual physical copying of sounds from an existing recording for use in a new recording, even if accomplished with slight modifications such as changes to pitch or tempo. *See Newton v. Diamond*,

388 F.3d 1189, 1192 (9th Cir. 2004) (discussing the term "sampling").

Plaintiff asserts that it holds copyrights to the composition and to the sound recording of *Love Break*. Plaintiff argues that, because *Vogue* contains sampled material from *Love Break*, Defendants have violated both copyrights. Although Plaintiff originally asserted improper sampling of strings, vocals, congas, "vibraslap," and horns from *Love Break* as well as another song, Plaintiff now asserts a sole theory of infringement: When creating two commercial versions of *Vogue*, Pettibone sampled a "horn hit"[1] from *Love Break*, violating Plaintiff's copyrights to both the composition and the sound recording of *Love Break*.

The horn hit appears in *Love Break* in two forms. A "single" horn hit in *Love Break* consists of a quarter-note chord comprised of four notes—E-flat, A, D, and F—in the key of B-flat. The single horn hit lasts for 0.23 seconds. A "double" horn hit in *Love Break* consists of an eighth-note chord of those same notes, followed immediately by a quarter-note chord of the same notes. Plaintiff's expert identified the instruments as "predominantly" trombones and trumpets.

The alleged source of the sampling is the "instrumental" version of *Love Break*,[2] which lasts 7 minutes and 46 seconds. The single horn hit occurs 27 times, and the double

---

[1] Plaintiff prefers the label "horn part," but the label has no effect on the legal analysis. For simplicity, we follow the district court's convention.

[2] The label "instrumental" is misleading: The recording contains many vocals. But again we adopt the terminology used by the district court.

horn hit occurs 23 times. The horn hits occur at intervals of approximately 2 to 4 seconds in two different segments: between 3:11 and 4:38, and from 7:01 to the end, at 7:46. The general pattern is single-double repeated, double-single repeated, single-single-double repeated, and double-single repeated. Many other instruments are playing at the same time as the horns.

The horn hit in *Vogue* appears in the same two forms as in *Love Break*: single and double. A "single" horn hit in *Vogue* consists of a quarter-note chord comprised of four notes—E, A-sharp, D-sharp, and F-sharp—in the key of B-natural.[3] A double horn hit in *Vogue* consists of an eighth-note chord of those same notes, followed immediately by a quarter-note chord of the same notes.

The two commercial versions of *Vogue* that Plaintiff challenges are known as the "radio edit" version and the "compilation" version. The radio edit version of *Vogue* lasts 4 minutes and 53 seconds. The single horn hit occurs once, the double horn hit occurs three times, and a "breakdown" version of the horn hit occurs once.[4] They occur at 0:56, 1:02, 3:41, 4:05, and 4:18. The pattern is single-double-double-double-breakdown. As with *Love Break*, many other instruments are playing at the same time as the horns.

---

[3] In musical terms, assuming that the composition was copied, Pettibone "transposed" the horn hit in *Love Break* by one-half step, resulting in notes that are half a step higher in *Vogue*.

[4] The record does not appear to disclose the meaning of a "breakdown" version of the horn hit, and neither party attributes any significance to this form of the horn hit.

The compilation version of *Vogue* lasts 5 minutes and 17 seconds. The single horn hit occurs once, and the double horn hit occurs five times. They occur at 1:14, 1:20, 3:59, 4:24, 4:40, and 4:57. The pattern is single-double-double-double-double-double. Again, many other instruments are playing as well.

One of Plaintiff's experts transcribed the composition of the horn hits in the two songs as follows. *Love Break*'s single horn hit:



*Vogue*'s single horn hit:



*Love Break*'s double horn hit:



*Vogue*'s double horn hit:



In a written order, the district court granted summary judgment to Defendants on two alternative grounds. First, neither the composition nor the sound recording of the horn hit was "original" for purposes of copyright law. Second, the court ruled that, even if the horn hit was original, any sampling of the horn hit was "de minimis or trivial." In a separate order, the district court awarded attorney's fees to Defendants under 17 U.S.C. § 505. Plaintiff timely appeals both orders.

DISCUSSION

Plaintiff has submitted evidence of actual copying. In particular, Tony Shimkin has sworn that he, as Pettibone's personal assistant, helped with the creation of *Vogue* and that, in Shimkin's presence, Pettibone directed an engineer to introduce sounds from *Love Break* into the recording of *Vogue*. Additionally, Plaintiff submitted reports from music experts who concluded that the horn hits in *Vogue* were sampled from *Love Break*. Defendants do not concede that sampling occurred, and they have introduced much evidence to the contrary.[5] But for purposes of summary judgment, Plaintiff has introduced sufficient evidence (including direct evidence) to create a genuine issue of material fact as to whether copying in fact occurred. Taking the facts in the light most favorable to Plaintiff, Plaintiff has demonstrated actual copying. Accordingly, our analysis proceeds to the next step.

---

[5] For example, Plaintiff hired Shimkin and then brought this action, raising doubts about Shimkin's credibility; Pettibone and others testified that Shimkin was not present during the creation of *Vogue* and was not even employed by Pettibone at that time; and Defendants' experts dispute the analysis and conclusions of Plaintiff's experts.

Our leading authority on actual copying is *Newton*, 388 F.3d 1189. We explained in *Newton* that proof of actual copying is insufficient to establish copyright infringement:

> For an unauthorized use of a copyrighted work to be actionable, the use must be significant enough to constitute infringement. *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 74–75 (2d Cir. 1997). This means that even where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial. *See Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A], at 13-30.2. The principle that trivial copying does not constitute actionable infringement has long been a part of copyright law. Indeed, as [a judge] observed over 80 years ago: "Even where there is some copying, that fact is not conclusive of infringement. Some copying is permitted. In addition to copying, it must be shown that this has been done to an unfair extent." *West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833, 861 (E.D.N.Y. 1909). This principle reflects the legal maxim, *de minimis non curatlex* (often rendered as, "the law does not concern itself with trifles"). *See Ringgold*, 126 F.3d at 74–75.

*Newton*, 388 F.3d at 1192–93. In other words, to establish its infringement claim, Plaintiff must show that the copying was greater than de minimis.

Plaintiff's claim encompasses two distinct alleged infringements: infringement of the copyright to the *composition* of *Love Break* and infringement of the copyright to the *sound recording* of Love Break. *Compare* 17 U.S.C. § 102(a)(2) (protecting "musical works") *with id.* § 102(a)(7) (protecting "sound recordings"); *see Erickson v. Blake*, 839 F. Supp. 2d 1132, 1135 n.3 (D. Or. 2012) ("Sound recordings and musical compositions are separate works with their own distinct copyrights."); *see also Newton*, 388 F.3d at 1193–94 (noting the distinction). We squarely held in *Newton*, 388 F.3d at 1193, that the de minimis exception applies to claims of infringement of a copyrighted composition. But it is an open question in this circuit whether the exception applies to claims of infringement of a copyrighted sound recording.

Below, we address (A) whether the alleged copying of the composition or the sound recording was de minimis, (B) whether the de minimis exception applies to alleged infringement of copyrighted sound recordings, and (C) whether the district court abused its discretion in awarding attorney's fees to Defendants under 17 U.S.C. § 505.[6]

---

[6] Because we affirm the judgment on the ground that any copying was de minimis, we do not reach Defendants' alternative arguments. Accordingly, we assume without deciding that the horn hits are "original." *See Newton*, 388 F.3d at 1192 (assuming originality). We also assume without deciding that Pettibone is not a co-owner of *Love Break*.

A. *Application of the De Minimis Exception*

A "use is de minimis only if the average audience would not recognize the appropriation." *Newton*, 388 F.3d at 1193; *see id.* at 1196 (affirming the grant of summary judgment because "an average audience would not discern Newton's hand as a composer . . . from Beastie Boys' use of the sample"); *Fisher v. Dees*, 794 F.2d 432, 435 n.2 (9th Cir. 1986) ("As a rule, a taking is considered *de minimis* only if it is so meager and fragmentary that the average audience would not recognize the appropriation."); *see also Dymow v. Bolton*, 11 F.2d 690, 692 (2d Cir. 1926) ("[C]opying which is infringement must be something which ordinary observations would cause to be recognized as having been taken from the work of another." (internal quotation marks omitted)). Accordingly, we must determine whether a reasonable juror could conclude that the average audience would recognize the appropriation. We will consider the composition and the sound recording copyrights in turn.[7]

1. *Alleged Infringement of the Composition Copyright*

When considering an infringement claim of a copyrighted musical composition, what matters is not how the musicians actually played the notes but, rather, a "generic rendition of the composition." *Newton*, 388 F.3d at 1194; *see id.* at 1193 (holding that, when considering infringement of the

---

[7] It appears that Plaintiff did not introduce into the summary judgment record a copy of the copyrighted composition and did not introduce a copy of one of the two allegedly infringing sound recordings. We need not decide whether those omissions are fatal to Plaintiff's claims. For purposes of our analysis, we accept the partial transcription of the composition by Plaintiff's expert, and we analyze the sound recordings that Plaintiff did submit.

composition copyright, one "must remove from consideration all the elements unique to [the musician's] performance"). That is, we must compare the written compositions of the two pieces.

Viewing the evidence in the light most favorable to Plaintiff, Defendants copied two distinct passages in the horn part of the score for *Love Break*. First, Defendants copied the quarter-note single horn hit. But no additional part of the score concerning the single horn hit is the same, because the single horn hit appears at a different place in the measure. In *Love Break*, the notes for the measure are: half-note rest, quarter-note rest, single horn hit. In *Vogue*, however, the notes for the measure are: half-note rest, eighth-note rest, single horn hit, eighth-note rest. Second, Defendants copied a full measure that contains the double horn hit. In both songs, the notes for the measure are: half-note rest, eighth-note rest, eighth-note horn hit, quarter-note horn hit. In sum, Defendants copied, at most, a quarter-note single horn hit and a full measure containing rests and a double horn hit.

After listening to the recordings, we conclude that a reasonable jury could *not* conclude that an average audience would recognize the appropriation of the composition. Our decision in *Newton* is instructive. That case involved a copyrighted composition of "a piece for flute and voice." *Newton*, 388 F.3d at 1191. The defendants used a six-second sample that "consist[ed] of three notes, C—D flat—C, sung over a background C note played on the flute." *Id.* The composition also "require[d] overblowing the background C note that is played on the flute." *Id.* The defendants repeated a six-second sample "throughout [the song], so that it appears over forty times in various renditions of the song." *Id.* at 1192. After listening to the recordings, we affirmed the grant

of summary judgment because "an average audience would not discern [the composer's] hand as a composer." *Id.* at 1196.

The snippets of the composition that were (as we must assume) taken here are much smaller than the sample at issue in *Newton*. The copied elements from the *Love Break* composition are very short, much shorter than the six-second sample in *Newton*. The single horn hit lasts less than a quarter-second, and the double horn hit lasts—even counting the rests at the beginning of the measure—less than a second. Similarly, the horn hits appear only five or six times in *Vogue*, rather than the dozens of times that the sampled material in *Newton* occurred in the challenged song in that case. Moreover, unlike in *Newton*, in which the challenged song copied *the entire composition* of the original work for the given temporal segment, the sampling at issue here involves only *one instrument group* out of many. As noted above, listening to the audio recordings confirms what the foregoing analysis of the composition strongly suggests: A reasonable jury could not conclude that an average audience would recognize an appropriation of the *Love Break* composition.

### 2. *Alleged Infringement of the Sound Recording Copyright*

When considering a claimed infringement of a copyrighted sound recording, what matters is how the musicians *played* the notes, that is, how their rendition distinguishes the recording from a generic rendition of the same composition. *See Newton*, 388 F.3d at 1193 (describing the protected elements of a copyrighted sound recording as "the elements unique to [the musician's] performance").

Viewing the evidence in the light most favorable to Plaintiff, by accepting its experts' reports, Pettibone sampled one single horn hit, which occurred at 3:35 in *Love Break*. Pettibone then used that sampled single horn hit to create the double horn hit used in *Vogue*.

The horn hit itself was not copied precisely. According to Plaintiff's expert, the chord "was modified by transposing it upward, cleaning up the attack slightly in order to make it punchier [by truncating the horn hit] and overlaying it with other sounds and effects. One such effect mimicked the reverse cymbal crash. . . . The reverb/delay 'tail' . . . was prolonged and heightened." Moreover, as with the composition, the horn hits are not isolated sounds. Many other instruments are playing at the same time in both *Love Break* and *Vogue*.

In sum, viewing the evidence in the light most favorable to Plaintiff, Pettibone copied one quarter-note of a four-note chord, lasting 0.23 seconds; he isolated the horns by filtering out the other instruments playing at the same time; he transposed it to a different key; he truncated it; and he added effects and other sounds to the chord itself.[8] For the double horn hit, he used the same process, except that he duplicated the single horn hit and shortened one of the duplicates to create the eighth-note chord from the quarter-note chord. Finally, he overlaid the resulting horn hits with sounds from many other instruments to create the song *Vogue*.

---

[8] For all of those reasons, we decline to apply the "fragmented literal similarity" test: Defendants did not copy "a portion of the plaintiff's work exactly or nearly exactly." *Newton*, 388 F.3d at 1195; *see also Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 n.4 (9th Cir. 1997) (rejecting the category of "fragmented literal similarity").

After listening to the audio recordings submitted by the parties, we conclude that a reasonable juror could *not* conclude that an average audience would recognize the appropriation of the horn hit. That common-sense conclusion is borne out by dry analysis. The horn hit is very short—less than a second. The horn hit occurs only a few times in *Vogue*. Without careful attention, the horn hits are easy to miss. Moreover, the horn hits in *Vogue* do not sound identical to the horn hits from *Love Break*. As noted above, assuming that the sampling occurred, Pettibone truncated the horn hit, transposed it to a different key, and added other sounds and effects to the horn hit itself. The horn hit *then* was added to *Vogue* along with many other instrument tracks. Even if one grants the dubious proposition that a listener recognized some similarities between the horn hits in the two songs, it is hard to imagine that he or she would conclude that sampling had occurred.

A quirk in the procedural history of this case is illuminating on this point. Plaintiff's primary expert originally *misidentified* the source of the sampled double horn hit. In his original report, the expert concluded that both a single horn hit *and a double horn hit* were sampled from *Love Break*. The parties later discovered the original tracks to *Vogue* and were able to listen to the horn hits without interference from the many other instruments. After listening to those tracks, the expert decided that he had erred in opining that a double horn hit was sampled. He concluded instead that only a single horn hit was sampled, which was used to create the double horn hit in *Vogue*. In other words, a highly qualified and trained musician listened to the recordings with the express aim of discerning which parts of the song had been copied, and he could not do so accurately. An average audience would not do a better job.

In sum, the district court correctly held that summary judgment to Defendants was appropriate on the issue of de minimis copying.

## B. *The De Minimis Exception and Sound Recordings*

Plaintiff argues, in the alternative, that even if the copying here is trivial, that fact is irrelevant because the de minimis exception does not apply to infringements of copyrighted sound recordings. Plaintiff urges us to follow the Sixth Circuit's decision in *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), which adopted a bright-line rule: For copyrighted sound recordings, any unauthorized copying—no matter how trivial—constitutes infringement.

The rule that infringement occurs only when a substantial portion is copied is firmly established in the law. The leading copyright treatise traces the rule to the mid-1800s. 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[A][2][a], at 13-56 to 13-57, 13-57 n.102 (2013) (citing *Folsom v. Marsh*, 9 F. Cas. 342, No. 4901 (C.C. Mass. 1841)); *id.* § 13.03[E][2], at 13-100 & n.208 (citing *Daly v. Palmer*, 6 F. Cas. 1132, No. 3,552 (C.C.S.D.N.Y. 1868)); *see also Perris v. Hexamer*, 99 U.S. (9 Otto) 674, 675–76 (1878) (stating that a "copyright gives the author or the publisher the exclusive right of multiplying copies of what he has written or printed. It follows that to infringe this right a substantial copy of the whole or of a material part must be produced."); *Dymow*, 11 F.2d 690 (applying the rule in 1926). We recognized the rule as early as 1977: "If copying is established, then only does there arise the second issue, that of illicit copying (unlawful appropriation). On that issue the test is the response of the ordinary lay hearer . . . ." *Sid &*

*Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977) (alteration and internal quotation marks omitted), *superseded in other part by* 17 U.S.C. § 504(b); *see Fisher*, 794 F.2d at 434 n.2 (using the term "de minimis" to describe the concept). The reason for the rule is that the "plaintiff's legally protected interest [is] the potential financial return from his compositions which derive from the lay public's approbation of his efforts." *Krofft*, 562 F.2d at 1165 (quoting *Arnstein v. Porter*, 154 F.2d 464, 473 (2d Cir. 1946)). If the public does not recognize the appropriation, then the copier has not benefitted from the original artist's expressive content. Accordingly, there is no infringement.

Other than *Bridgeport* and the district courts following that decision, we are aware of no case that has held that the de minimis doctrine does not apply in a copyright infringement case. Instead, courts consistently have applied the rule in *all* cases alleging copyright infringement. Indeed, we stated in dictum in *Newton* that the rule "applies *throughout the law of copyright*, including cases of music sampling."[9] 388 F.3d at 1195 (emphasis added).

Plaintiff nevertheless argues that Congress intended to create a special rule for copyrighted sound recordings, eliminating the de minimis exception. We begin our analysis with the statutory text.

---

[9] Defendants incorrectly assert that the quoted sentence controls the outcome in this case. *Newton* considered an alleged infringement of the *composition* only; it had no occasion to consider—and did not consider—the argument that a different rule applies to the infringement of *sound recordings*.

Title 17 U.S.C. § 102, titled "Subject matter of copyright: In general," states, in relevant part:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) *sound recordings*; and

(8) architectural works.

(Emphasis added.) That provision treats sound recordings identically to all other types of protected works; nothing in the text suggests differential treatment, for any purpose, of sound recordings compared to, say, literary works. Similarly, nothing in the neutrally worded statutory definition of "sound recordings" suggests that Congress intended to eliminate the de minimis exception. *See id.* § 101 ("'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.").

Title 17 U.S.C. § 106, titled "Exclusive rights in copyrighted works," states:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works,

pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

Again, nothing in that provision suggests differential treatment of de minimis copying of sound recordings compared to, say, sculptures. Although subsection (6) deals exclusively with sound recordings, that subsection concerns public performances; nothing in its text bears on de minimis copying.

Instead, Plaintiff's statutory argument hinges on the third sentence of 17 U.S.C. § 114(b), which states:[10]

---

[10] The full subsection states:

The exclusive right of the owner of copyright in a sound recording under clause (1) of section 106 is limited to the right to duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording. The exclusive right of the owner of copyright in a sound recording under clause (2) of

> The exclusive rights of the owner of copyright
> in a sound recording under clauses (1) and (2)
> of section 106 do not extend to the making or
> duplication of another sound recording that
> consists entirely of an independent fixation of
> other sounds, even though such sounds imitate
> or simulate those in the copyrighted sound
> recording.

Like all the other sentences in § 114(b), the third sentence
imposes an express *limitation* on the rights of a copyright
holder: "The exclusive rights of the owner of a copyright in
a sound recording . . . *do not extend* to the making or

---

section 106 is limited to the right to prepare a derivative
work in which the actual sounds fixed in the sound
recording are rearranged, remixed, or otherwise altered
in sequence or quality. The exclusive rights of the
owner of copyright in a sound recording under clauses
(1) and (2) of section 106 do not extend to the making
or duplication of another sound recording that consists
entirely of an independent fixation of other sounds,
even though such sounds imitate or simulate those in
the copyrighted sound recording. The exclusive rights
of the owner of copyright in a sound recording under
clauses (1), (2), and (3) of section 106 do not apply to
sound recordings included in educational television and
radio programs (as defined in section 397 of title 47)
distributed or transmitted by or through public
broadcasting entities (as defined by section 118(f)):
*Provided*, That copies or phonorecords of said
programs are not commercially distributed by or
through public broadcasting entities to the general
public.

17 U.S.C. § 114(b). Nothing in the other sentences advances Plaintiff's
argument.

duplication of another sound recording [with certain qualities]." *Id.* (emphasis added); *see id.* (first sentence: "exclusive rights . . . do not extend" to certain circumstances; second sentence: "exclusive rights . . . do not extend" to certain circumstances; fourth sentence: "exclusive rights . . . do not apply" in certain circumstances). We ordinarily would hesitate to read an *implicit expansion* of rights into Congress' statement of an *express limitation* on rights. Given the considerable background of consistent application of the de minimis exception across centuries of jurisprudence, we are particularly hesitant to read the statutory text as an unstated, implicit elimination of that steadfast rule.

A straightforward reading of the third sentence in § 114(b) reveals Congress' intended limitation on the rights of a sound recording copyright holder: A new recording that mimics the copyrighted recording is not an infringement, even if the mimicking is very well done, so long as there was no actual copying. That is, if a band played and recorded its own version of *Love Break* in a way that sounded very similar to the copyrighted recording of *Love Break*, then there would be no infringement so long as there was no actual copying of the recorded *Love Break*. But the quoted passage does not speak to the question that we face: whether Congress intended to eliminate the longstanding de minimis exception for sound recordings in all circumstances even where, as here, the new sound recording as a whole sounds nothing like the original.

Even if there were some ambiguity as to congressional intent with respect to § 114(b), the legislative history clearly confirms our analysis on each of the above points. Congress intended § 114 to limit, not to expand, the rights of copyright holders: "The approach of the bill is to set forth the copyright

owner's exclusive rights in broad terms in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow. Thus, everything in section 106 is made 'subject to sections 107 through 118,' and must be read in conjunction with those provisions." H.R. Rep. No. 94-1476, at 61 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5674.

With respect to § 114(b) specifically, a House Report stated:

> Subsection (b) of section 114 makes clear that statutory protection for sound recordings extends only to the particular sounds of which the recording consists, and would not prevent a separate recording of another performance in which those sounds are imitated. Thus, infringement takes place whenever all *or any substantial portion* of the actual sounds that go to make up a copyrighted sound recording are reproduced in phonorecords by repressing, transcribing, recapturing off the air, or any other method, or by reproducing them in the soundtrack or audio portion of a motion picture or other audiovisual work. Mere imitation of a recorded performance would not constitute a copyright infringement even where one performer deliberately sets out to simulate another's performance as exactly as possible.

*Id.* at 106, *reprinted in* 1976 U.S.C.C.A.N. at 5721 (emphasis added). That passage strongly supports the natural reading of § 114(b), discussed above. Congress intended to make clear

VMG SALSOUL V. CICCONE                25

that imitation of a recorded performance cannot be infringement so long as no actual copying is done. There is no indication that Congress intended, through § 114(b), to expand the rights of a copyright holder to a sound recording.

Perhaps more importantly, the quoted passage articulates the principle that "infringement takes place whenever all *or any substantial portion* of the actual sounds . . . are reproduced." *Id.* (emphasis added). That is, when enacting this specific statutory provision, Congress clearly understood that the de minimis exception applies to copyrighted sound recordings, just as it applies to all other copyrighted works. In sum, the statutory text, confirmed by the legislative history, reveals that Congress intended to maintain the de minimis exception for copyrighted sound recordings.

In coming to a different conclusion, the Sixth Circuit reasoned as follows:

> [T]he rights of sound recording copyright holders under clauses (1) and (2) of section 106 "do not extend to the making or duplication of another sound recording that consists *entirely* of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording." 17 U.S.C. § 114(b) (emphasis added). The significance of this provision is amplified by the fact that the Copyright Act of 1976 added the word "entirely" to this language. *Compare* Sound Recording Act of 1971, Pub. L. 92-140, 85 Stat. 391 (Oct. 15, 1971) (adding subsection (f) to former 17 U.S.C. § 1) ("does not extend to the

> making or duplication of another sound
> recording that is an independent fixation of
> other sounds"). In other words, a sound
> recording owner has the exclusive right to
> "sample" his own recording.

*Bridgeport*, 410 F.3d at 800–01.

We reject that interpretation of § 114(b). *Bridgeport* ignored the statutory structure and § 114(b)'s express *limitation* on the rights of a copyright holder. *Bridgeport* also declined to consider legislative history on the ground that "digital sampling wasn't being done in 1971." 410 F.3d at 805. But the state of technology is irrelevant to interpreting Congress' intent as to statutory structure. Moreover, as Nimmer points out, *Bridgeport*'s reasoning fails on its own terms because contemporary technology plainly allowed the copying of small portions of a protected sound recording. Nimmer § 13.03[A][2][b], at 13-62 n.114.16.

Close examination of *Bridgeport*'s interpretive method further exposes its illogic. In effect, *Bridgeport* inferred from the fact that "exclusive rights . . . *do not extend* to the making or duplication of another sound recording that *consists entirely* of an independent fixation of other sounds," 17 U.S.C. § 114(b) (emphases added), the conclusion that exclusive rights *do extend* to the making of another sound recording that *does not consist* entirely of an independent fixation of other sounds. As pointed out by Nimmer, *Bridgeport*'s interpretive method "rests on a logical fallacy." Nimmer § 13.03[A][2][b], at 13-61; *see also Saregama India Ltd. v. Mosley*, 687 F. Supp. 2d 1325, 1340–41 (S.D. Fla. 2009) (critiquing *Bridgeport*'s interpretive method for a similar reason). A statement that rights do not extend to a

particular circumstance does not automatically mean that the rights extend to all other circumstances. In logical terms, it is a fallacy to infer the inverse of a conditional from the conditional. *E.g.*, Joseph G. Brennan, *A Handbook of Logic* 79–80 (2d ed. 1961).

For example, take as a given the proposition that "if it has rained, then the grass is not dry." It does not necessarily follow that "if it has not rained, then the grass is dry." Someone may have watered the lawn, for instance. We cannot infer the second if-then statement from the first. The first if-then statement does not tell us *anything* about the condition of the grass if it has not rained. Accordingly, even though it is true that, "if the recording consists entirely of independent sounds, then the copyright does not extend to it," that statement does not necessarily mean that "if the recording does not consist entirely of independent sounds, then the copyright does extend to it."

The Sixth Circuit also looked beyond the statutory text, to the nature of a sound recording, and reasoned:

> [E]ven when a small part of a sound recording is sampled, the part taken is something of value. No further proof of that is necessary than the fact that the producer of the record or the artist on the record intentionally sampled because it would (1) save costs, or (2) add something to the new recording, or (3) both. For the sound recording copyright holder, it is not the "song" but the sounds that are fixed in the medium of his choice. When those sounds are sampled they are taken directly from that

fixed medium. It is a physical taking rather
than an intellectual one.

*Bridgeport*, 410 F.3d at 801–02 (footnote omitted).

We disagree for three reasons. *First*, the possibility of a
"physical taking" exists with respect to other kinds of artistic
works as well, such as photographs, as to which the usual de
minimis rule applies. *See, e.g.*, *Sandoval v. New Line Cinema
Corp.*, 147 F.3d 215, 216 (2d Cir. 1998) (affirming summary
judgment to the defendant because the defendant's use of the
plaintiff's photographs in a movie was de minimis). A
computer program can, for instance, "sample" a piece of one
photograph and insert it into another photograph or work of
art. We are aware of no copyright case carving out an
exception to the de minimis requirement in that context, and
we can think of no principled reason to differentiate one kind
of "physical taking" from another. *Second*, even accepting
the premise that sound recordings differ qualitatively from
other copyrighted works and therefore *could warrant* a
different infringement rule, that theoretical difference does
not mean that Congress *actually adopted* a different rule.
*Third*, the distinction between a "physical taking" and an
"intellectual one," premised in part on "sav[ing] costs" by not
having to hire musicians, does not advance the Sixth Circuit's
view. The Supreme Court has held unequivocally that the
Copyright Act protects only the expressive aspects of a
copyrighted work, and *not* the "fruit of the [author's] labor."
*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349
(1991). Indeed, the Supreme Court in *Feist* explained at
length why, though that result may seem unfair, protecting
only the expressive aspects of a copyrighted work is actually
a key part of the design of the copyright laws. *Id.* at 349–54
(explaining how "the 'sweat of the brow' doctrine flouted

basic copyright principles"). Accordingly, all that remains of
*Bridgeport*'s argument is that the second artist has taken
some expressive content from the original artist. But that is
always true, regardless of the nature of the work, and the de
minimis test nevertheless applies. *See* Nimmer
§ 13.03[A][2][b], at 13-63 to 13-64 (providing a similar
critique of *Bridgeport*'s physical/intellectual distinction and
concluding that it "seems to be built on air").

Because we conclude that Congress intended to maintain
the "de minimis" exception for copyrights to sound
recordings, we take the unusual step of creating a circuit split
by disagreeing with the Sixth Circuit's contrary holding in
*Bridgeport*. We do so only after careful reflection because,
as we noted in *Seven Arts Filmed Entertainment Ltd. v.
Content Media Corp.*, 733 F.3d 1251, 1256 (9th Cir. 2013),
"the creation of a circuit split would be particularly
troublesome in the realm of copyright. Creating inconsistent
rules among the circuits would lead to different levels of
protection in different areas of the country, even if the same
alleged infringement is occurring nationwide." (Citation,
internal quotations marks, and brackets omitted.) We
acknowledge that our decision has consequences. But the
goal of avoiding a circuit split cannot override our
independent duty to determine congressional intent.
Otherwise, we would have no choice but to blindly follow the
rule announced by whichever circuit court decided an issue
first, even if we were convinced, as we are here, that our
sister circuit erred.

Moreover, other considerations suggest that the
"troublesome" consequences ordinarily attendant to the
creation of a circuit split are diminished here. In declining to
create a circuit split in *Seven Arts*, we noted that "the leading

copyright treatise," Nimmer, agreed with the view of our sister circuits. 733 F.3d at 1255. As to the issue before us, by contrast, Nimmer devotes many pages to explaining why the Sixth Circuit's opinion is, in no uncertain terms, wrong. Nimmer § 13.03[A][2][b], at 13-59 to 13-66.

Additionally, as a practical matter, a deep split among the federal courts *already exists*. Since the Sixth Circuit decided *Bridgeport*, almost every district court not bound by that decision has declined to apply *Bridgeport*'s rule. *See, e.g.*, *Saregama*, 687 F. Supp. 2d at 1340–41 (rejecting *Bridgeport*'s rule after analysis); *Steward v. West*, No. 13-02449, Docket No. 179 at 14 n.8 (C.D. Cal. 2014) (unpublished civil minutes) ("declin[ing] to follow the per se infringment analysis from *Bridgeport*" because *Bridgeport* "has been criticized by courts and commentators alike"); *Batiste v. Najm*, 28 F. Supp. 3d 595, 625 (E.D. La. 2014) (noting that, because some courts have declined to apply *Bridgeport*'s rule, "it is far from clear" that *Bridgeport*'s rule should apply); *Pryor v. Warner/Chappell Music, Inc.*, No. CV13-04344, 2014 WL 2812309, at *7 n.3 (C.D. Cal. June 20, 2014) (unpublished) (declining to apply *Bridgeport*'s rule because it has not been adopted by the Ninth Circuit); *Zany Toys, LLC v. Pearl Enters., LLC*, No. 13-5262, 2014 WL 2168415, at *11 n.7 (D.N.J. May 23, 2014) (unpublished) (stating *Bridgeport*'s rule without discussion); *see also EMI Records Ltd v. Premise Media Corp.*, No. 601209, 2008 WL 5027245 (N.Y. Sup. Ct. Aug. 8, 2008) (unpublished) (expressly rejecting *Bridgeport*'s analysis). Although we are the first circuit court to follow a different path than *Bridgeport*'s, we are in well-charted territory.

Plaintiff next argues that, because Congress has not amended the copyright statute in response to *Bridgeport*, we

should conclude that *Bridgeport* correctly divined congressional intent. We disagree. The Supreme Court has held that congressional inaction in the face of a judicial statutory interpretation, even with respect to the Supreme Court's own decisions affecting the entire nation, carries almost no weight. *See Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) ("It is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation." (internal quotation marks omitted)). Here, Congress' inaction with respect to a decision by one circuit court has even less import, especially considering that many other courts have declined to apply *Bridgeport*'s rule.

Finally, Plaintiff advances several reasons why *Bridgeport*'s rule is superior *as a matter of policy*. For example, the Sixth Circuit opined that its bright-line rule was easy to enforce; that "the market will control the license price and keep it within bounds"; and that "sampling is never accidental" and is therefore easy to avoid. *Bridgeport*, 410 F.3d at 801. Those arguments are for a legislature, not a court. They speak to what Congress *could decide*; they do not inform what Congress *actually decided*.[11]

---

[11] It also is not clear that the cited policy reasons are necessarily persuasive. For example, this particular case presents an example in which there is uncertainty as to enforcement—musical experts disagree as to whether sampling occurred. As another example, it is not necessarily true that the market will keep license prices "within bounds"—it is possible that a bright-line rule against sampling would unduly stifle creativity in certain segments of the music industry because the licensing costs would be too expensive for the amateur musician. In any event, even raising these counter-points demonstrates that the arguments, as Plaintiff concedes, rest on policy considerations, not on statutory interpretation. One cannot answer questions such as how much licensing

We hold that the "de minimis" exception applies to actions alleging infringement of a copyright to sound recordings.

## C. *Attorney's Fees*

Finally, we consider the district court's award of attorney's fees to Defendants. The Copyright Act permits a court to "award a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. "[A]ttorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). "In deciding whether to award fees under the Copyright Act, the district court should consider, among other things: the degree of success obtained on the claim; frivolousness; motivation; objective reasonableness of factual and legal arguments; and need for compensation and deterrence." *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 (9th Cir. 1996).

Here, the district court concluded that Plaintiff's legal claim premised on *Bridgeport* was objectively unreasonable because, in the court's view, Plaintiff should have been aware of the critiques of *Bridgeport* and should have declined to bring the claim. In relying on that reasoning, the court erred as a matter of law. It plainly is reasonable to bring a claim founded on the only circuit-court precedent to have considered the legal issue, whether or not our circuit ultimately agrees with that precedent.

---

cost is too much without exercising value judgments—matters generally assigned to the legislature.

VMG SALSOUL V. CICCONE                    33

The district court also ruled that Plaintiff's claim was objectively unreasonable because of issues that hinged on "disputed facts and credibility determinations." Again, the court erred as a matter of law. If a plaintiff has a claim that hinges on disputed facts sufficient to reach a jury, that claim necessarily is reasonable because a jury might decide the case in the plaintiff's favor.

Because the district court erred in finding that Plaintiff's claim was objectively unreasonable, we vacate the award of fees and remand for reconsideration.

**Judgment AFFIRMED; award of fees VACATED and REMANDED for reconsideration.** The parties shall bear their own costs on appeal.

SILVERMAN, Circuit Judge, dissenting:

The plaintiff is the owner of a copyright in a fixed sound recording. This is a valuable property right, the stock-in-trade of artists who make their living recording music and selling records. The plaintiff alleges that the defendants, without a license or any sort of permission, physically copied a small part of the plaintiff's sound recording – which, to repeat, is property belonging to the plaintiff – and, having appropriated it, inserted into their *own* recording. If the plaintiff's allegations are to be believed, the defendants deemed this maneuver preferable to paying for a license to use the material, or to hiring their own musicians to record it. In any other context, this would be called theft. It is no defense to theft that the thief made off with only a "de minimis" part of the victim's property.

The majority chooses to follow the views of a popular treatise instead of an on-point decision of the Sixth Circuit, a decision that has governed the music industry in Nashville – "Music City"[1] – and elsewhere for over a decade without causing either the sky to fall in, or Congress to step in.  And just exactly what is the Sixth Circuit's radical holding in *Bridgeport Music, Inc. v. Dimension Films* that the majority finds so distasteful?  It's this: if you want to use an *identical copy* of a portion of a copyrighted fixed sound recording – we're not talking about "substantially similar" tunes or rhythms, but an actual *identical copy* of a sound that has already been recorded in a fixed medium – get a license.  You can't just take it.  410 F.3d 792, 800–01 (6th Cir. 2005).

As the majority acknowledges, after *Newton v. Diamond*, 388 F.3d 1189 (9th Cir. 2003), it is an "open question" in the Ninth Circuit whether a de minimis defense applies to fixed sound recordings as it does to less tangible works.  The *Bridgeport* court explained why it should not.

First, by statute, sound recording copyright holders have an *exclusive* right to sample their *own* recordings.  It's an exclusive right; the statute does not give that right to others. 410 F.3d at 800–01.  Under 17 U.S.C. §§ 106 and 114, the holder of a copyright in a sound recording (but not others) has the exclusive right to reproduce the work in copies or records "that directly or indirectly recapture the actual sounds fixed in the recording," as well as the exclusive right to prepare derivative works "in which the actual sounds fixed in the

---

[1] Nashville also describes itself as the "Songwriting Capital of the World." *See* The Story of Music City, Nashville Convention & Visitors Corp., http://www.visitmusiccity.com/visitors/aboutmusiccity/storyofmusiccity (last visited May 20, 2016).

sound recording are rearranged, remixed, or otherwise altered in sequence or quality." 17 U.S.C. §§ 106(1) and (2); 114(b). Congress clearly qualified these exclusive rights, writing that "another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording" are not within the scope of the copyright holder's exclusive rights. 17 U.S.C. § 114(b). In other words, the world at large is free to imitate or simulate the creative work fixed in the recording (like a tribute band, for example) so long as an actual copy of the sound recording itself is not made. 410 F.3d at 800.

The majority rejects this straightforward reading, explaining by way of a rhetorical exercise that *Bridgeport*'s reading of § 114(b) is a logical fallacy, expanding the rights of copyright holders beyond that allowed under the judicial de minimis rule. As I see it, it is the majority that tortures the natural reading of these provisions. Bear in mind that § 114(b) simply explains the scope of exclusive rights already granted to copyright holders under § 106. These two provisions must be read together, as the Sixth Circuit did. 410 F.3d at 799–801. When read together, their message is clear: copyright holders have exclusive rights to their recordings, but cannot be heard to complain (i.e., there can be no infringement of those exclusive rights) where a new recording consists *entirely* of independently created sounds, such as might be found in a very good imitation. By the same token, if a new recording includes something other than independently created sounds, such as a blatant copy, the copyright holder whose work was sampled has a legitimate gripe. That right was not invented by the Sixth Circuit: it already exists in the statutes. And these statutes say nothing about the de minimis exception.

The second reason the Sixth Circuit gave for not adopting the de minimis rule is that sound recordings are different than their compositional counterparts: when a defendant copies a recording, he or she takes not the song but the sounds as they are fixed in the medium of the copyright holders' choice. *Id.* at 801–02. In other words, the very nature of digital sampling makes a de minimis analysis inapplicable, since sampling or pirating necessarily involves copying a fixed performance. *See id.* at 801 n.13. The defendants wanted horns to punctuate their song, so they took the plaintiff's copyrighted recording of horns. The horn hit is brief, but clearly perceptible and does its job. This is unlike indiscernible photographs used, not for their content (which cannot be made out), but to dress a movie set. *See Sandoval v. New Line Cinema Corp.*, 147 F.2d 215, 218 (2d Cir. 1998).

This is a physical taking, not an intellectual one. *Id.* at 802. Sampling is never accidental. *Id.* at 801. As the Sixth Circuit observed, it is not like the case of a composer who has a melody in his head, perhaps not even realizing that the reason he hears this melody is that it is the work of another that he has heard before. *Id.* When you sample a sound recording you know you are taking another's work product. *Id.* Accordingly, the pertinent inquiry in a sampling case is not whether a defendant sampled a little or a lot, but whether a defendant sampled at all. *Id.* at 798 n.6, 801–02 and n.13.

Again, the majority disagrees, rejecting *Bridgeport*'s characterization of a sample as a "physical taking" on the basis that copyright protection extends only to expressive aspects of a work, not the fruit of the author's labor. According to the majority, copyright protection doesn't extend to the sweat of an author's brow. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (discussing

originality as applied to factual compilations, such as
telephone directories). But that's irrelevant here, since there
is no question that the underlying sound recording can be
copyrighted, and it is the taking of that protectable work that
is at issue.

I find *Bridgeport*'s arguments well-reasoned and
persuasive. Equally compelling is, I think, Congress's silence
in the wake of *Bridgeport*, especially in light of the fact that
the Sixth Circuit explicitly invited Congress to clarify or
change the law if *Bridgeport*'s bright-line rule was not what
Congress intended. 410 F.3d at 805. While it's true that
congressional inaction in the face of judicial interpretation is
not ironclad evidence of Congressional approval, *see
Alexander v. Sandoval*, 532 U.S. 275, 292 (2001), it's not
chopped liver either. In this case *Bridgeport* has not been
hiding out in the woods, waiting to be found: it has been
governing the music industry in Nashville and elsewhere for
eleven years. The majority now proposes to introduce a
different rule for this circuit, creating a circuit split, and
providing a lower level of protection for copyright holders in
a different area of the country. *See Seven Arts Filmed
Entertainment Ltd. v. Content Media Corp. PLC*, 733 F.3d
1251, 1256 (9th Cir. 2013). This inconsistent approach is
plainly in contravention of Congressional intent that
copyright laws be predictable and uniform, yet the majority
defends its rogue path on the ground that Congress must have
intended something other than what the Sixth Circuit has
concluded, even though we've heard not a peep from
Congress, or for that matter the Supreme Court, in the eleven
years since *Bridgeport* has been on the books.

In short, the majority's fuzzy approach would require a
factual and largely visceral inquiry into whether each and

every instance of sampling was "substantial," whereas *Bridgeport* provides in the case of a fixed sound recording a bright-line rule, and I quote: "Get a license or do not sample." 410 F.3d at 801. True, *Get a license or do not sample* doesn't carry the same divine force as *Thou Shalt Not Steal*, but it's the same basic idea. I would hold that the de minimis exception does not apply to the sampling, copying, stealing, pirating, misappropriation – call it what you will – of copyrighted fixed sound recordings. Once the sound is fixed, it is tangible property belonging to the copyright holder, and no one else has the right to take even a little of it without permission. I therefore respectfully dissent.[2]

---

[2] Since I think that summary judgment was improperly granted on the plaintiff's sampling claims, I also would reverse the award of attorneys' fees. However, I agree with the majority that the fee award was erroneous in any event. I also agree that the district court properly granted summary judgment on the plaintiff's composition infringement claim.